and Del Blaine M. Jr. Appellees by Stephen Watts v. Stephen A. Appont by John Renn. Thank you. Mr. Renn? Good morning. May it please the Court, Mr. Watts, this is a case about the Peter the Father Registry. In this case we're saying the trial court erred in dismissing Stephen Alton based on the failure to sign the Peter the Father Registry. Dismissal by the trial court is not consistent with the purpose of the Peter the Father Registry Act. Dismissal is not appropriate because both the parents signed an acknowledgement of parenthood. Dismissal is not appropriate because Stephen A. had established and repeated contact with his daughter. Dismissal is wrong because the statute suggests failing to sign results in prima facie evidence of grounds for termination. In effect that would suggest or imply that there is a next step which would allow the father to defend himself on a termination hearing. Finally, if the court were to find the statute does support dismissal of the father in this particular case, then under the facts of the case the application of the statute would violate the Constitution in regards to both the Equal Protection Clause and the Due Process Clause. As regards to the standard of review, I believe it's de novo for both statutory construction and also for the constitutionality portions of the argument. In regards to the facts of this particular case, it's undisputed that Stephen A. was the father. It's admitted that he's not the ideal father when the court gets into the facts of this case, but he was the father of Sarah. Sarah does have the same last name as my client. Stephen and Sarah lived together soon after her birth. When she was born he was in the county jail in Peoria. Upon his release he did live with his daughter. They lived together for a couple of months, the mother, the father, and the child. At that point in time is when they signed this agreement that was notarized to give custody of the child to the mother's sibling. Is that written agreement part of this record on appeal? Frankly, no. I was not aware of it until we actually had the hearing. It came out at the hearing. That was not part of the record in the trial court or the record on the appeal. So how can we consider that? Well, I think both parties acknowledge or agree under oath that they signed a document that I call a poor man's custody agreement. They didn't have the funds to hire an attorney, but they did try and do what they could to formalize some sort of a document that would allow the mother's brother to take custody of the child and be able to represent that he had authority for taking the child to doctors and other types of agencies or entities that would need confirmation of his authority to have the child. So the trial court didn't view that document? No. Nobody has viewed the document, but both parties did testify what the document was about and what it was for. Wasn't it for temporary guardianship for medical purposes? It was temporary guardianship. What had happened, I believe, was DCFS had come into the trailer where the mother and the father were living. There were some concerns about the child staying in that residence, and what the parents agreed to do at that time was to transfer the child to another adult, which happened to be the mother's, I think, brother. And they signed a document, they put it together, they took it to a bank, and what it did was it acknowledged or both of them said that he was the father, he was the mother, and they notarized it and took it in, and then they provided it to their brother. So he had a document saying that this is the child I have, I have permission to have that. And it's not the statutory acknowledgment of paternity. But it is a written acknowledgment of paternity, and I think under the facts of this case, that should be enough to keep my client from being dismissed from the adoption proceeding. It seems like beyond that, the trial court's decision is really based on some sense of abandonment, whether under statute or either statute. I think that's a fair assessment. I mean, there's another provision under the Act that allows, there's some exceptions to signing the pediatric father registry and when a person can keep their child. And one of the exceptions, which was argued in front of the court, was it dealt with continuous contact with the child and support of the child, which is similar to abandonment, I would guess. It says, I think that provision states that even if you don't register, if you maintain substantial and continuous support, is what the statute provides. But then there's also a provision, which is important in this case, that as far as the contact, considers visiting at least monthly when not prevented from doing so. And in this case, we have a couple of different factors preventing the doing so as the child gets a little older. In particular, what happens is after the agreement is signed and the child goes in with the brother and his family, they do take the child back in again, the mother and the father, and they live for about a year together as a family one more time. After this, my client goes back into the system. He's in the prison this time as opposed to jail. By the time he's released from jail, when he's in jail, he has no control over his contact as far as ability to be there for the child. After he gets out of jail, there's an order of protection in place against him keeping him from having contact with the mother and the child. That order of protection, ironically, is in place because the father was, in the mother's word, trying to maintain too much contact when he was in the halfway house by continuing to call her and text her. Text the mother? I believe so, yes. Doesn't he disavow being her father in a letter that he sent to the mother while he was in prison? Yes, there is a letter that includes language saying that, but I believe that if you read the entire letter, and when the mother was asked about it, the flavor of the letter is, I want to be back with you. I want to be back with you and my child. Why don't you let me into your life? Although in the letter, he says, you're no longer my child. I no longer consider you, I don't know, he says, I no longer consider my wife. I didn't say wife, they weren't married. I did say wife, but they weren't married. But yes, he does put language in there that says I don't consider you my child. But if you read the whole letter, you can tell he's frustrated because he wants to be back in their life, and the mother admits to that on the stand during the hearing that we had in the trial court. When was he released from prison? Well, there's been multiple imprisonments, multiple releases. He was released initially in May of 2005, which was a month after the child was born. He went back into the prison, I believe it was in November of 2007, and then he was in prison until the end of 2009, I believe it was again the end of the year in 2009, although I don't have that at the top of my head. When he was released at that time, he was released, I believe, to a halfway house in Cook County, and at that time is when the order of protection was in place, keeping him from contacting. And there was some testimony, I believe, in the trial court about allegations of him trying to get around that order of protection by having third parties try and contact the mother and that there was issues with that. That was not a big part of the testimony, but I believe there was some testimony about that, about continuing trying to contact and being told not to. And then he was back in the system again, and I, forgive me, I don't remember exactly when he went back in, but I know that when we had the hearing and when all this was going on in the trial court, he was in the Department of Corrections again. I could be mistaken, but I thought there was a period of time where he was not incarcerated, but before the order of protection was entered. I don't believe that. Well, that's true, but that was when they were living together. I was thinking more in 2008. No, I don't believe that is the way the facts came into play on this case. I think that he was... He was in Peoria in 2009 as part of work release. He may have been elsewhere before that, but I'll check later. Okay. Thank you. All right. The other point that we want to make would be dismissal is not consistent with the express purpose of the putative father registry, which is to give notice to potential fathers of the act. And in this particular case, the mother and the father both agree who the father is, he was provided notice, he entered into the case, and then he got dismissed because he didn't sign the registry. So I think when you interpret a statute, you look at the express purpose of it, and it doesn't seem like it really has anything to do with this particular case. Now, as far as the other argument we have is if you look at the actual statute in regards to subpart H, it talks about what happens in regards to the failure to sign the putative father registry. And in that particular provision, it states that the failure to sign is prima facie evidence of sufficient grounds to support termination. Anytime we have that, as lawyers we know that means that's going to present a presumption that you usually get a right to rebut. In this particular case, he's not getting a right to rebut. There's a presumption, and then boom, he's kicked out of the case. That doesn't seem to make sense in the context of this case where you have a father that's involved in the case, and that everybody agrees is the father. I think that the only way you could interpret that would be that he would be entitled to a termination hearing instead of a dismissal based on a failure to sign the registry. But it's more than just a failure to sign the registry, right? A, he didn't sign the registry, and then the judge found that he had not met any of the registry exceptions. That's true, Your Honor, but I also think that the whole basis for it, I mean, if he had signed the registry, he'd still be in this case. He didn't sign the registry, he's kicked out of the case. I understand the argument you're making, but I mean, if he would have signed, he'd still be in and none of those bases would make any difference. He's essentially dismissed because he didn't sign the registry, and then he didn't fit into one of the pigeonholes which sidesteps us into the next arguments, which are the constitutional arguments. If the court were to find, hey, if you expressly provide that statute, he should have been dismissed, then under the facts of this case, the statute's unconstitutional. And the first basis of that is the equal protection clause, and under Illinois, equal protection constitutional provisions, if there is a statute that treats differently based on sex, the statute must withstand strict scrutiny, and there's no presumption of constitutionality. And in this case, if you look and switch the places of it, if you had a mother who had a child, and the mother had absolutely no contact, as opposed to the limited contact we talked about in this case, but the mother is in and out of prison, gives the child to somebody else as soon as the child is born, but there's no adoption, no termination, adoption proceeding pops up later, mother is automatically in the ballgame. She's not kicked out because of a failure to sign some registry. And in this case, it's undisputed that not only did my client not sign the registry, but he didn't know about the putative father registry until this whole case began. And I would suspect that most people on the street don't know about a putative father registry. We have a man who claims he's the father, but he's never allowed his name to be placed on the birth certificate. He's never formally acknowledged paternity as required under the Paternity Act. He's never formally paid support. Why do you keep calling him the father? There's been no determination by DNA that he's the biological father. He's never asserted a right as a biological father. So I just have a problem with, again, why are you claiming that he's the father and therefore there's this constitutional deprivation? Well, first off, the mother under oath said he was the father and she says that in her pleadings when she filed this. The father said he was the father under his pleadings and also under oath at the hearing. Beyond that, the court, and again in the constitutional context, you look at the Lair case, and there is a difference. Just being father does not necessarily mean you are father for constitutional protection. But there is, if you have some contact with that child, if you do establish some relationship with the child, then you do have a significant liberty interest that can't be broken up by a due process clause by the failure to sign the type of registration. What is the significant relationship that you're claiming? Okay. What I'm claiming is they lived together for a couple of months right after the child was born. After that, it was testified to by both the parents that he would go and visit with the child when the child was staying with the mother's brother. Although there was some dispute in the testimony about how he interacted at that. Sometimes he stayed in the car and didn't go in. He would say something different. The mother said differently as to what went on there. What was the trial court's finding with regard to the conflicting versions of what happened? There was no specific finding on the conflicting versions of that, but there was a specific finding that the trial court would side with mother on contested issues of fact based upon the letters that were put into the record. And my client admitted, I believe there were four different letters put into the record. My client admitted to writing two of them. He did not admit to writing two of the other ones. The trial court said that, you know, I think he wrote all four of these. If you're going to lie to me about basically which letters he wrote, I'm going to side with mother on contested issues of fact. Counselor, you have a chance. Okay. So you're asking us to disregard the trial court's findings? No, I think that you can make these findings based on the agreed to or stipulated facts. That he did go and see the child during the time that it was with the brother. And I think there's also agreed to testimony that they lived together after the child was given back from the brother to the mother and the father. And they lived together for another year or so after that. So there is a relationship here. Now, he went into prison. He was not there when he was in prison with the family. And when he got out of prison he did have an order of protection against him. It would be a much better case if he lived with them the entire time from my side of the aisle. But we have the facts that we do have. And I do think there is some relationship here with the child. Could he have a relationship with the child? This may be off subject slightly and I apologize. Have a relationship with the child and then abandon the child? Yes, that is possible. I guess that's the earlier argument and I apologize if that's right because you're asking a different question here. No, and I think that that also could be related to, and again, I think a basis for termination would be abandonment. But in this case it essentially kicked him out of the game without even having a termination hearing for failing to sign the putative father registry. In a best case scenario, given everything that's here, I don't know how he withstands a petition for termination. I mean, I don't know how putting him back in the game helps him. Because, I mean, he's been in prison so we know he's got a felony within ten years. He has the support of the child. There's the presumption if he's going to get to rebut it. As you say, it's signed, so I don't know really where we get your client even if we give you the relief you're asking for. I think that, I mean, I don't, as far as the imprisonment or felony, I don't believe, and forgive me if I'm mistaken on this, but I don't think either one of those is a basis by itself that his rights would be terminated because he's been in prison. I think that the fact that he has not paid support, I believe that is a factor that goes into it. I think that the issues included, at least for what we had in regards to the putative father registry, the ability to have funds to pay for the support. And again, there's not a lot of ability that's in the record in regards to what he was doing or what he had for income. But I don't think that just because he's been in prison and hasn't paid under these circumstances his grounds by itself to have a termination, where you're supposed to have termination by clear and convincing evidence. In this case, there's disputed evidence and it's essentially the basis of not signing the registry that he's not even entitled to the termination hearing. Well, in this case, we have somebody who's willing to step forward and adopt the child and function as a father. She hasn't had a father figure for seven years. So I think the putative father registry act requires us to balance a little bit. Is this a man that we want to postpone the adoption for? Is this somebody who has maintained repeated and continuous interaction with the child? And even assuming all the facts you've pointed out to me are true, I just have a hard time setting aside the trial court's finding that he didn't qualify as an exception to the putative father registry act based on repeated and continuous contact with the child. So I understand maybe your better argument is this written acknowledgment of paternity, but it's a document you haven't provided us with. If I had it, I'd provide it. I don't have it. And I mean, that's what we have. But I think that they both have agreed that that's what it is. And I think that that is sufficient in itself to meet the exception to get around the filing of the registry. And again, I think if you look at the constitutional cases, there is some relationship here. And I think that he falls into the part that he has a protected interest. And with that, I think that he's entitled to a hearing in regards to the termination of criminal rights under both Blair and I think Stanley as well. Thank you. Mr. Watts. Good morning, Your Honors. Mr. Wren. Your Honors, paternity was never established in this case. He's never come forward and admitted that he was the father of the child and taken that full commitment of responsibility for parentages suggested is required in the Lair case. He does not have a relationship with the child. What Mr. Wren has called a relationship was a period of around 17 to 19 months when the child was just born and the age of around two and a half. There has been no communication with the child from the father to the child according to the mother. And that was what the court accepted as true since November, early December of 2007. That proximity and the relationship he's referring to refers to the fact that he lived with the mother during this period of time, during these 17, 18, 19 months. Proximity does not amount to a relationship. We all know the cliche of the uninvolved father who until the child is 5, 6, 7, 8, potty trained and so forth, then takes an active interest in the child. And as the mother described this relationship, and you have it before you in the briefs, he did not take an active relationship again. The judge accepted the credibility of the mother on these issues. While he was incarcerated up until sometime, I know the last letter that was attributed to him was in 2008. Correct. But the order of protection didn't go into effect until November of 2009. Was there any written correspondence from prison to the child? Other than what you have before you, I'm not aware of any, Your Honor. I mean, I understand that he couldn't force the child to come to the prison for visitation, but based on this record, is there any attempt by him to communicate with the child before the order of protection was issued and after the last letter disavowing she was his child? No, Your Honor. There is no indication in the record of any kind that he attempted to communicate with the child in any way. Going to those letters, Mr. Wren, I believe, argues that he, Mr. Stephen A., has made a full commitment to fatherhood, and he has a relationship with the child. And I direct you to the evidence of the letters. A person who had made a full commitment to his relationship with the child, what he said was, if you take up with another man, if you get involved with someone else, I'm going to abandon the child, and I want nothing else to do with it. And he said that to the mother, and he said that to the child in his letter to the child. If he had made a full commitment to paternity and to the child, what would he have said? I hate you, Mom. I hate you for taking up with another man. But I will never abandon my relationship with Sarah, and I will always be there as her father and for her. He did exactly the opposite. That does not show an established relationship, nor does it show a commitment to paternity. Your Honor, I really have nothing further to say. We don't believe this man has ever demonstrated any paternal instincts in regards to this child, and we would ask that you uphold the trial court's finding. Do you agree essentially that the substantive issue here is whether or not he was abandoned under the act? Your Honor, I would say that the issue is paternity. He's never established paternity. Well, under either the acknowledgment or the, if not acknowledged, subclause. He clearly stated that he wished to abandon the child, and he said so in no uncertain terms on four different occasions. So, yes, I would say that that's a central issue also. He abandoned the child and has not made the commitment to a relationship with that child. What about Mr. Wren's point that mother testified under oath he's the biological father? Is that good enough under the Parentage Act? No, Your Honor, it is not. Under the Parentage Act, he would have to have signed an acknowledgment underneath the provisions of the Vital Records Act. I would suggest to you that he sign some kind of document. Obviously, the parties thought that it was important that he sign it. But the purpose of that document was not acknowledgment of paternity. It was not acknowledgment of support. It was not acknowledgment of custody. It was simply to allow the brother of the mother to take the child to the doctor. That does not rise to an acknowledgment of paternity. Didn't he claim also that he signed the acknowledgment of paternity after he got released from prison, but Mom didn't file it because she didn't have the money to file it? That's what he testified to. Did the court find that credible? No. And the brother testified that he got angry with her and tore up the paper and threw it on the floor. So that's my response. All right. Thank you. Thank you. Thank you. Thank you. Mr. Renn? I don't know the response. I was afraid of that. I was trying to find something, and now my mind has gone blank as to exactly what I was looking for. But as far as the issue about the letters, it's my understanding, and I couldn't find it as I was scrambling in the record. The mother brought the letters and put them into the record. I believe there was testimony that my client wrote letters like every other day to her. I believe that was testimony of my client. I don't think that the mother testified about that or said that there was letters every other day. I do believe that the mother did admit that she got the order of protection based upon the contact that was being made by my client. By telephone, I think. Yes. Repeated telephonic phone calls and messages, text messages. Yes, and I believe that would have been in 2009, right around the time. To help you just a little bit, though, I do think the trial court found those letters weren't designed to disavow his relationship with the child, but actually were kind of an ineffective way to woo mother back. I do think the trial court viewed those letters maybe in a more neutral fashion than Mr. Watts would like us to. Well, I mean, if you read the language, if you slice out language in those letters, you're like, this is an awful person. He would never want this person to be dead. The trial court didn't make that finding. Exactly. If you read the whole context of them, and the mother admitted that on the stand, and the trial court did find that. Your client's difficulty in this case is paternity, when you are not married to the biological mother, cannot just be established by a verbal statement. There has to be some formal action. And that's the difficulty in this case, but I certainly understand that the trial court did make some findings that were favorable to your client. And I just want to point out again that I think that when you look at the statute there, they have it in, they call it an acknowledgment of paternity at one time, and another time they say an acknowledgment of paternity as under the Vital Records Act, or as under one of the other acts that are cited in these. These acts seem to cite each other back and forth, and it seems to open the door. You could talk to the lawmakers about it. It seems to open the door to an acknowledgment of paternity, could be an acknowledgment of paternity, other than the statute, the one cited in the statute. You've done a nice job of arguing on behalf of your client today, I think. Thank you. Is there any other questions? Okay, we will be taking the matter under advisement and rendering a decision without undue delay, because we do recognize this involves a minor and some pretty substantial parental rights as well. But now we'll take a short recess for Panel 2.